**Electronically Filed
Intermediate Court of Appeals
30023
06-DEC-2013
10:02 AM**

NO. 30023

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


IN THE MATTER OF UNITED PUBLIC WORKERS, AFSCME,
Local 646, AFL-CIO (2008-007), Petitioner/Appellant-Appellant,
and KATHRYN S. MATAYOSHI, Superintendent, Department
of Education, State of Hawaiʻi; RESHELA DUPUIS, Director,
Charter School Administrative Office; WENDY W. LAGARETA,
Director, Waiʻalae Elementary School; and NEIL DIETZ,
Chief Negotiator, Office of Collective Bargaining,
State of Hawaiʻi, Intervenors/Appellees-Appellees, and
HAWAII LABOR RELATIONS BOARD; JAMES B. NICHOLSON; EMORY
J. SPRINGER; and SARAH R. HIRAKAMI, Agency/Appellees-Appellees


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 09-1-0501)


MEMORANDUM OPINION
(By:  Nakamura, Chief Judge, Foley and Leonard, JJ.)

In a secondary appeal arising out of a dispute over
collective bargaining, Petitioner/Appellant/Appellant United
Public Workers, AFSCME, Local 646, AFL-CIO (**UPW**), appeals from an
August 19, 2009 Circuit Court of the First Circuit (**Circuit
Court**) Judgment in favor of Intervenors/Appellees/Appellees
Patricia Hamamoto, Superintendent, Department of Education, State
of Hawaiʻi (**Superintendent**), Rashela DuPuis, Director, Charter
School Administrative Office (**Executive Director**), Wendy W.
Lagareta, Director, Waiʻalae Elementary School (**Lagareta**), and
Marie Laderta, Chief Negotiator, Office of Collective Bargaining,
State of Hawaiʻi (**Chief Negotiator**),[1] and Agency/Appellees/

---

[1]     Pursuant to Hawaiʻi Rules of Appellate Procedure Rule 43(c),
Kathryn S. Matayoshi and Neil Dietz are automatically substituted as the
(continued...)

Appellees Hawai'i Labor Relations Board, James B. Nicholson, Emory J. Springer, and Sarah R. Hirakami ("**HLRB**" or "**Board**").[2] On March 7, 2008, UPW submitted a Petition for Declaratory Ruling (**Petition**) to the HLRB seeking a definitive ruling on three issues relating to charter school collective bargaining. In HLRB Order No. 2585, issued February 2, 2009 (**HLRB Order**), the HLRB agreed with UPW on two issues, but disagreed on the third. UPW appealed to the Circuit Court, which affirmed the HLRB Order. On appeal to this court, UPW raises four points of error related to the Circuit Court's decision to affirm the HLRB Order. We affirm.

I.    BACKGROUND FACTS

    A.    Statutory Framework

        "Collective bargaining" is governed by Hawaii Revised Statutes (**HRS**) Chapter 89, and is defined as:

> the performance of the mutual obligations of the public employer and an exclusive representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to wages, hours, amounts of contributions by the State and counties to the Hawaii employer-union health benefits trust fund, and other terms and conditions of employment, except that by any such obligation neither party shall be compelled to agree to a proposal or be required to make a concession.

HRS § 89-2 (2012). An "exclusive representative" is the "employee organization certified by the board under section 89-8 as the collective bargaining agent to represent all employees in an appropriate bargaining unit[.]" Id. Pursuant to HRS § 89-5 (2012), the HLRB was established, inter alia, "to ensure that collective bargaining is conducted in accordance with" HRS Chapter 89.

        Pursuant to HRS § 89-6(a) (2012), all employees throughout the State, within specific enumerated categories, form the various collective bargaining units. HRS § 89-6(d) further

---

[1](...continued)
Superintendent and Chief Negotiator, respectively. The Executive Director's office was eliminated as of July 1, 2013. 2012 Haw. Sess. Laws Act 130 §§ 3, 23.

[2]    The Honorable Victoria S. Marks presided.

specifies the "employers" for the purpose of negotiating collective bargaining agreements for each bargaining unit.

The State of Hawai'i Department of Education (**DOE**) is an executive department headed by an elected policy-making board, known as the Board of Education (**BOE**). HRS § 302A-1101(a) (Supp. 2012). The BOE has the power "to formulate statewide educational policy, adopt student performance standards and assessments models, monitor school success, and appoint the superintendent of education as the chief executive officer of the public school system." Id. The DOE Superintendent shall have "jurisdiction over the internal organization, operation, and management of the public school system . . . and shall administer programs of education and public instruction throughout the State[.]" HRS § 302A-1111(a) (2007). While the charter school system is administratively attached to the DOE (see HRS § 302B-3(a) (Supp. 2011)), charter schools "operate independent educational programs from those provided by the department of education statewide." 1999 Haw. Sess. Laws Act 62, § 1 at 77.

The Office of Collective Bargaining and Managed Competition (**OCB**) was established to assist the Governor in, amongst other things, "negotiations between the State and the exclusive representatives on matters of wages, hours, and other negotiable terms and conditions of employment." HRS § 89A-1(a) (2012); see also HRS § 89A-2(3) (2012). The OCB is headed by the Chief Negotiator. HRS § 89A-1(b). Amongst other functions and duties, the OCB shall "[c]onduct negotiations with the exclusive representatives of each employee organization and designate employer spokespersons for each negotiation[.]" HRS § 89A-2.

Charter schools were first authorized by the Hawai'i State Legislature (**Legislature**) in 1999, pursuant to Act 62, in order to "increase the flexibility and autonomy at the school level by allowing existing public schools and new schools to be designated as new century charter schools." 1999 Haw. Sess. Laws Act 62, § 1 at 77. The Legislature's intent was to

> nurture the ideal of more autonomous and flexible decision-making at the school level . . . free of bureaucratic red tape and accommodating of the individual needs of students

> to allow the State to dramatically improve its educational
> standards for the twenty-first century.

Id. In order to allow educators to better tailor the curriculum
to enhance student learning, each new century charter school

> shall have a local school board as a governing body, and
> shall operate independent educational programs from those
> provided by the department of education statewide.

Id. Schools designated as new century charter schools were to be
"exempt from all applicable state laws," except, in relevant
part, laws regarding

> (1) Collective bargaining under chapter 89; provided that:
>
> > (A) The exclusive representatives defined in chapter
> > 89 may enter into agreements that contain cost and
> > noncost items to facilitate decentralized decision-
> > making;
> >
> > (B) The exclusive representatives and the local school
> > board of the new century charter school may enter into
> > agreements that contain cost and noncost items; [and]
> >
> > . . . .
> >
> > (D) These agreements may differ from the master
> > contracts[.]

Id., § 2 at 79-80 (HRS § 302A-1184). Act 62 of 1999 was
originally codified as HRS Chapter 302A-1181 through 1192, and
was subsequently repealed and replaced in 2006. 2006 Haw. Sess.
Laws Act 298, § 3 at 1216.

In order to "create consistency and to clarify laws
relating to the governance of charter schools," in 2006, the
Legislature enacted Act 298, relating to charter schools. S.
Stand. Comm. Rep. No. 2881, in 2006 Senate Journal, at 1402; 2006
Haw. Sess. Laws Act 298, § 1 at 1200-01. Act 298 repealed HRS
Chapter 302A §§ 1181 through 1192, and recodified and reorganized
the statutes relating to charter schools into a new chapter,
codified as HRS Chapter 302B.[3] 2006 Haw. Sess. Laws Act 298,

---

[3] In 2012, the Legislature introduced Senate Bill 2115, which sought
to repeal HRS Chapter 302B and establish "a new charter school law that
creates a solid governance structure for Hawaii's charter school system with
clear lines of authority and accountability[.]" S.B. 2115, S.D. 2, H.D. 2,
C.D. 1, 26th Leg., Reg. Sess. (2012). Senate Bill 2115 was enacted into law
on June 19, 2012 as Act 130. See 2012 Haw. Sess. Laws Act 130. Senate Bill
2115 was set to "take effect upon its approval;" when the bill was signed into
law on June 19, 2012 as Act 130, HRS Chapter 302B was thereby repealed. 2012
(continued...)

§§ 1-2 at 1201-16. In addition to providing general consistency and clarity, Act 298 was intended to help "[c]larify[] collective bargaining provisions for charter school employees[.]" H. Stand. Comm. Rep. No. 1259, in 2006 House Journal, at 1580.

Pursuant to Act 298, HRS Chapter 302B authorized the establishment of a charter school system and set forth standards for the governance, administration, support, financing, autonomy, and accountability of charter schools. 2006 Haw. Sess. Laws Act 298, § 1 at 1201. Pursuant to HRS Chapter 302B, operational control over charter school workers is vested with the local school board (**LSB**) of each charter school; a LSB is the

> governing body of its charter school and shall be responsible for the financial and academic viability of the charter school, implementation of the charter, and the independent authority to determine the organization and management of the school, the curriculum, virtual education, and compliance with applicable federal and state laws. The local school board shall have the power to negotiate supplemental collective bargaining agreements with the exclusive representatives of their employees.

2006 Haw. Sess. Laws Act 298, § 2 at 1209 (HRS § 302B-7(c));[4] see also id. at 1202 (HRS § 302B-1).

Act 298 also established a "charter school administrative office" (**CSAO**), which was attached to the DOE "for

---

[3](...continued)
Haw. Sess. Laws Act 130, § 23 at 474. For brevity's sake, a reference to the chapter's repeal is not repeated with each citation to HRS Chapters 302A or 302B. Other statutes affected by Act 130 will be so noted. Act 130 has been codified at HRS Chapter 302D (Supp. 2012). In 2013, further changes were made to HRS Chapter 302D with the passage of Act 159, which became effective upon its approval on June 21, 2013. 2013 Haw. Sess. Laws Act 159, pp. 466-84. The effects of Act 159 are not addressed herein.

[4] Act 130 changed the nature of the LSBs and renamed them "governing boards." 2012 Haw. Sess. Laws Act 130, § 2 at 445. Pursuant to Act 130, governing boards are defined as "the independent board of a public charter school[.]" Id. The authority of the former LSBs "to negotiate supplemental collective bargaining agreements with the exclusive representatives of their employees" was preserved and given to the governing boards. Id. Moreover, Act 130 added the provision that a governing board "is considered the employer of charter school employees for purposes of Chapters 76, 78, and 89", thus confirming and clarifying the authority of the governing board to enter into HRS Chapter 89 [collective bargaining] agreements on behalf of their charter school employees. Id.

administrative purposes only."[5]   2006 Haw. Sess. Laws Act 298, § 2 at 1209 (HRS § 302B-8).[6]   The CSAO is administered by the Executive Director and, in consultation with the charter schools, is responsible for, *inter alia*, representing charter schools and the charter school system in communications with the Board, the Governor, and the Legislature, "[c]omplying with applicable state laws related to the administration of the charter schools[,]" and "[u]pon request by one or more charter schools, assisting in the negotiation of a collective bargaining agreement with the exclusive representative of its employees."  2006 Haw. Sess. Laws Act 298, § 2 at 1210 (HRS § 302B-8(b)(3), (15) (Supp. 2011)).

Act 298 also amended HRS Chapter 89 in order to "make conforming amendments . . . in accordance with the provisions of the new charter school law."  2006 Haw. Sess. Laws Act 298, § 4 at 1216.  A new section governing charter school collective bargaining was added in order to clarify ambiguity with regard to how charter schools "fit" into the scheme of collective bargaining over master collective bargaining agreements (**CBA**), and provides:

> (a) Employees of charter schools shall be assigned to an appropriate bargaining unit as specified in section 89-6[.]
>
> (b) For the purpose of <u>negotiating a collective bargaining agreement for charter school employees</u> who are assigned to an appropriate bargaining unit, the <u>employer shall be determined as provided in section 89-6(d)</u>.
>
> (c) For the purpose of <u>negotiating a memorandum of agreement or a supplemental agreement that only applies to employees of a charter school</u>, the <u>employer shall mean the local</u>

---

[5]      As discussed by this Court in <u>Water of Life Sch. Bd. v. Charter Sch. Review Panel</u>, "[t]he charter school system . . . is administratively attached to DOE, one of the principal departments under the executive branch of the State.  As part of a State entity administratively attached to DOE, the LSB is considered an arm of the State."  126 Hawai'i 183, 189, 268 P.3d 436, 432 (App. 2011) (citation omitted).

[6]      Pursuant to Act 130, "[a]ll rights, powers, functions, and duties of the charter school administrative office as established pursuant to section 302B-8, Hawaii Revised Statutes, are transferred to the charter school administrative office as established pursuant to section 3 of [Act 130]."  2012 Haw. Sess. Laws Act 130, § 18 at 473.  The "new" charter school administrative office, however, is maintained only until July 1, 2013.  2012 Haw. Sess. Laws Act 130, §§ 3, 23 at 467-69, 474.  It appears from the Act that once the "new" charter school administrative office is dissolved, administrative functions will be turned over to the individual charter schools, a newly-formed charter school commission, and/or the DOE.

> school board, subject to the conditions and requirements
> contained in the applicable sections of this chapter
> governing any memorandum of agreement or supplemental
> agreement.
>
> (d) Negotiations over matters covered by this section shall
> be conducted between the employer and exclusive
> representative pursuant to this chapter. . . .

2006 Haw. Sess. Laws Act 298, § 5 at 1216-17 (HRS § 89-10.55) (emphasis added).[7] The 2006 amendments to HRS Chapter 89 made clear, for the first time, that charter schools were subject to the master CBA negotiated by the State, and which apply generally to an entire bargaining unit (to non-charter school employees and charter school employees alike). The 2006 amendments also stated, for the first time, that LSBs were empowered to "negotiate memorandums of agreement or supplemental collective bargaining agreements with the exclusive representatives of their employees."[8] Id. § 1 at 1201 (HRS § 89-10.55(c)). Act 298 further provided that charter schools are required to adhere to collective bargaining laws under HRS Chapter 89:

> (A) The exclusive representatives as defined in chapter 89
> and the local school board of the charter school may enter
> into supplemental agreements that contain cost and noncost
> items to facilitate decentralized decision-making; [and]
>
> . . . .
>
> (C) These supplemental agreements may differ from the master
> contracts negotiated with the department [of education.]

2006 Haw. Sess. Laws Act 298, § 2 at 1211 (HRS § 302B-9).[9]

   B. Proceedings Below

   On October 20, 1971, UPW was certified as the exclusive bargaining representative of blue collar non-supervisory

---

[7] Act 130 amended HRS § 89-10.55 to change references from LSBs and the charter school administrative office to "governing board" and "charter school authorizer," respectively. See 2012 Haw. Sess. Laws Act 130, § 6 at 470.

[8] Act 130 transferred the authority to negotiate MOA or supplemental agreements to the governing board of a charter school. 2012 Haw. Sess. Laws Act 130, § 6 at 470.

[9] Although Act 130 repealed HRS § 302B-9, this language remained intact in § 302D-25 (except for a single reference to the "local school board" which was changed to "governing board"). 2012 Haw. Sess. Laws Act 130, § 2 at 462.

employees in bargaining unit 1 (**Unit 1**). As the exclusive representative of all employees in Unit 1, UPW has "the right to act for and negotiate agreements covering all employees in the unit[.]" HRS § 89-8(a) (2012).

Prior to the repeal of HRS § 302A-1184, which extended the provisions of HRS Chapter 89 to the charter schools, UPW negotiated a memorandum of agreement (**MOA**) with the State and the DOE, signed on July 21, 2000. The July 21, 2000 MOA required the charter schools to comply with the requirements of the Unit 1 CBA "until it is replaced by a new Collective Bargaining Agreement," and to negotiate supplemental agreements to modify the Unit 1 CBA "under the auspices of the Office of Collective Bargaining."[10] Pursuant to HRS § 89-10.55, UPW and the relevant Unit 1 employer group subsequently negotiated a Unit 01 Master CBA covering the period from July 1, 2007 through June 30, 2009 (**Master Agreement**). The Master Agreement set forth the wages, hours, and other terms and conditions of employment for employees in bargaining Unit 1.

By letter dated December 12, 2007, addressed to the Chief Negotiator, the UPW requested negotiations "with all New Century Charter Schools through the Office of Collective Bargaining on supplemental agreements modifying the current collective bargaining agreement with all public employees." UPW indicated that its request was being made pursuant to HRS § 89-6(d) and the July 21, 2000 MOA, because "since July 21, 2000 all MOA's have been extended to each successive term of the Unit 1

---

[10] The July 21, 2000 MOA requires that charter schools negotiate via the OCB. UPW asserts that the MOA has been extended by the parties since July 21, 2000. The existence of the July 21, 2000 MOA was not addressed by the HLRB or the Circuit Court. However, it is well-established in the Hawai'i courts that "parties may not do by contract that which is prohibited by statute." SHOPO v. Soc'y of Prof'l Journalists - Univ. of Haw. Chapter, 83 Hawai'i 378, 405, 927 P.2d 386, 413 (1996) (citations, internal quotation marks, and brackets omitted). In SHOPO, the supreme court stated that "a court may not enforce a collective-bargaining agreement that is contrary to public policy," as it is "elementary that parties to a collective bargaining agreement cannot bargain for provisions that are contrary to law." Id. (citations and internal quotation marks omitted). Although UPW argues that the July 21, 2000 MOA continues to bind the charter schools to negotiate via the OCB, to the extent that HRS § 89-10.55 grants that specific authority to the LSBs, an MOA or supplemental agreement cannot divest the LSBs of that authority absent the specific authorization of each LSB.

Agreements to June 30, 2009 by mutual consent of the parties."
UPW further requested that the OCB "designate one spokesperson
for negotiations with all New Century Charter schools, and to
submit all proposals (if any) from the New Century Charter
Schools . . . to modify any section or provision of the existing
Unit 1 Agreement[.]"

By letter dated January 15, 2008, Laderta responded to
UPW's request for negotiations over supplemental agreements by
stating that HRS § 89-6(d)

> does not require that the Office of Collective Bargaining
> handle negotiation of such supplemental agreements. On the
> contrary, by statute, it is entirely up to each of the local
> school boards to determine for themselves who shall
> represent them in this regard. OCB has not been given such
> authority at this time.

Laderta further stated that the OCB did not have the authority to
comply with UPW's request to designate one spokesperson for
negotiations with all New Century Schools, as such authority
"could only be granted by way of the unanimous consent of the
respective local school boards of those Charter Schools[.]" In
so concluding, Laderta pointed to HRS § 302B-9(1)(A) (2007),
which provided:

> The exclusive representatives as defined in chapter 89 and
> the local school board of the charter school may enter into
> supplemental agreements that contain cost and noncost items
> to facilitate decentralized decision-making.

Accordingly, Laderta referred the UPW to the CSAO.

By letter dated January 30, 2008, UPW sent a request
for negotiations over supplemental agreements to the CSAO. In
the letter, UPW requested that the CSAO and each of the public
charter schools "submit responses to the specific request for
information . . . and have the representative contact the [UPW]
to schedule negotiations."

On March 7, 2008, UPW filed a Petition for Declaratory
Ruling (**Petition**) with the HLRB, requesting a declaratory order

pursuant to HRS § 91-8[11] and Hawaii Administrative Rules (**HAR**) § 12-42-9[12] that:

a. The authority to negotiate the terms and provisions of the master unit 1 agreement for the period covered by July 1, 2007 to June 30, [2009] rests exclusively with the UPW, Governor, the mayors of the various counties, the chief justice, and the Hawaii Health Systems Board of Directors pursuant to Section 89-10.55, (b), HRS, and in accordance with Section 89-6(d), HRS.

b. Local school boards of charter schools may not repudiate the terms of said unit 1 master agreement or supplemental agreements entered by and between the UPW and the Department of Education pursuant to Section 89-6(e), HRS.

c. Although local school boards of charter schools may negotiate memorandum of agreement or supplemental agreements that apply only to employees of their particular charter school under Section 89-10.55 (c), HRS, such agreements may not be inconsistent (or in conflict) with the master unit 1 agreement entered pursuant to Section 89-6(d), HRS, or prior memoranda of agreement or supplemental agreements entered by and between the UPW, the State of Hawaii, and the Department of Education entered pursuant to Section 89-6(e), HRS.

On March 25, 2008, the DOE Superintendent, the CSAO Director, the Director of Wai'alae Elementary School, and the Chief Negotiator of the OCB (collectively **"Intervenors"**), filed Petitions for Intervention with the HLRB, which were granted.

At a March 31, 2008 hearing, the HLRB clarified the three issues to be addressed in the requested declaratory ruling. The parties ultimately stipulated to UPW's first issue, regarding who has the authority to enter master CBAs, by agreeing that Act 298 and the 2006 amendments "made it clear that the charter

---

[11]     HRS § 91-8 (2012) provides:

**§ 91-8 Declaratory rulings by agencies.** Any interested person may petition an agency for a declaratory order as to the applicability of any statutory provision or of any rule or order of the agency. Each agency shall adopt rules prescribing the form of the petitions and the procedure for their submission, consideration, and prompt disposition. Orders disposing of petitions in such cases shall have the same status as other agency orders.

[12]     HAR Chapter 42 sets forth the rules of practice and procedure for the HLRB. HAR § 12-42-9(a) pertains to declaratory rulings by the Board.

schools are bound by the master collective bargaining agreement."
On May 27, 2008, Intervenors filed a "Motion to Dismiss [UPW's
Petition] and/or for Summary Judgement" requesting that the Board
grant summary judgment against UPW on the two remaining issues:

> 1) Who has the authority and/or responsibility to negotiate
> supplemental agreements on behalf of charter schools
> pursuant to HRS Section 89-10.55(c), and
>
> 2) Whether HRS Section 302B-9(a)(1) permits charter schools
> and public unions to enter into supplemental agreements that
> deviate from master agreements entered into pursuant to HRS
> Section 89-6(d) and/or supplemental agreements entered into
> pursuant to HRS 89-6(e).

The Intervenors argued that these issues were purely
questions of law, not fact, and therefore summary disposition was
appropriate. On June 26, 2008, UPW filed its opposition to
Intervenors' motion. A hearing on the motion was held on July
10, 2008, and the matter was taken under advisement by the Board.

On February 2, 2009, the HLRB issued the HLRB Order,
concluding that it would not dismiss UPW's Petition due to
"confusion in the past over the subject matter of the Petition
and the risk of future dispute, as well as the existing dispute
involving issues b and c raised in the Petition." The HLRB also
concluded that summary judgment on the issues presented in UPW's
Petition was warranted because "the issues presented by the UPW
are primarily legal in nature such that a hearing is not
required[.]"

As the parties had already agreed, the HLRB concluded
that:

> The authority to negotiate the terms and provisions of the
> master unit 1 agreement for the period covered by July 1
> 2007, to June 30, 2008, rests exclusively with the UPW,
> Governor, the mayors of the various counties, the chief
> justice, and the Hawaii Health Systems Corporation board of
> Directors pursuant to Section 89-10.55(b), HRS, and in
> accordance with Section 89-6(d), HRS.

In addition, the HLRB concluded that UPW is authorized
to negotiate a master CBA with the Unit 1 public employers, as
listed in HRS § 89-6(d)(1).

The HLRB Order highlighted an apparent contradiction in
the use of the term "employer" throughout HRS Chapter 89. As
alluded to by the HLRB, this apparent contradiction stems from

11

the different types of negotiations governed by Chapter 89: (1) master CBAs, (2) supplemental agreements or MOAs of general applicability (applying to employees of more than just the charter schools), and (3) supplemental agreements or MOAs affecting only employees of the charter schools. Although HRS § 89-10.55(b) defines employer "[f]or the purpose of negotiating a collective bargaining agreement for charter school employees who are assigned to an appropriate bargaining unit," as provided in section 89-6(d), "[f]or the purpose of negotiating a memorandum of agreement or a supplemental agreement that only applies to employees of a charter school," HRS § 89-10.55(c) defines "employer" as the LSB. Based on this statutory language, the HLRB concluded that

> the definition of the term "employer" as used in HRS § 89-10.55, notwithstanding HRS § 89-2, depends on the type of negotiation - such as a master agreement, or a supplemental agreement or MOA applicable only to employees of a charter school - and the meaning of the term "employer" will be governed by the specific statutory provision (such as HRS §§ 89-10.55(b) and 89-6(d), or § 89-10.55(c) relevant to that type of negotiation.

With regard to the second issue, the HLRB concluded:

> Local school boards of charter schools may not repudiate the terms of said Unit 01 master agreement or the terms of the memoranda of agreement or supplemental agreements entered by and between the UPW and the Department of Education pursuant to HRS § 89-6(e).

The HLRB noted that the Intervenors agreed with UPW that "local school[] boards may not repudiate the terms of master agreements negotiated by the employer group pursuant to HRS § 89-6(d)[,]" and therefore, the only remaining issue arose with respect to MOAs and supplemental agreements. The HLRB reasoned that HRS § 89-6 governs all public employees of the State, and therefore, MOAs and supplemental agreements negotiated pursuant to HRS § 89-6(e) apply to "employees of more than just the charter schools," and therefore includes the charter school employees, *i.e.*, an MOA that is applicable to all Unit 1 employees in the State. Although LSBs are not included in the definition of "employer" for the purpose of negotiating MOAs and supplemental agreements pursuant to HRS § 89-6(e), HRS § 89-10.55(c) authorizes a LSB to enter MOAs and supplemental

agreements "that only appl[y] to employees of a charter school." Accordingly, the HLRB concluded that following the 2006 enactment of HRS § 89-10.55, a charter school is bound by: (1) MOAs and supplemental agreements entered into by its own LSB pursuant to HRS § 89-10.55(c) and (2) MOAs and supplemental agreements entered into pursuant to HRS §§ 89-6(d) and (e), which are "applicable to employees of more than just the charter schools."

With regard to the third issue, whether a LSB has the authority to negotiate MOAs or supplemental agreements "inconsistent (or in conflict) with" a master CBA or a prior MOA or supplemental agreement entered by and between the UPW, the State, and the DOE pursuant to HRS § 89-6(e), the HLRB concluded:

> Absent express delegation by another local school board or statutory authority, local school boards may only negotiate on behalf of, and contractually bind, their own charter schools. However, the Board clarifies that more than one local school board may be involved in negotiations that affect more than one charter school (see HRS § 3-2B-8(b)(15)). Further, the Board concludes that MOAs or supplemental agreements so negotiated may be inconsistent or conflict with master agreements as well as supplemental agreements or MOAs negotiated pursuant to HRS § 89-6(e), subject to certain conditions and requirements contained in chapter 89 governing any memorandum of agreement or supplemental agreement, as discussed earlier.

With respect to the latter part of the ruling, the Board stated that HRS § 89-10.55(c) provides a limitation on the negotiation of an MOA or supplemental agreement, that such negotiations are "subject to the conditions and requirements contained in the applicable sections of this chapter governing any memorandum of agreement or supplemental agreement," but that there are few conditions and requirements contained in Chapter 89. Accordingly, the HLRB concluded that "there are no statutory provisions expressly prohibiting MOAs or supplemental agreements that are inconsistent or in conflict with the master agreements or subsequent MOAs or supplemental agreements entered into by the UPW, the State of Hawaii, and the DOE." The HLRB also pointed to HRS § 302B-9, which provides:

> (a) Charter schools shall be exempt from chapters 91 and 92 and all other state laws in conflict with this chapter, except those regarding:

(1) Collective bargaining under chapter 89; provided that:

(A) The exclusive representatives as defined in chapter 89 and the local school board of the charter school may enter into supplemental agreements that contain cost and noncost items to facilitate decentralized decision-making

. . . .

(C) **These supplemental agreements may differ from the master contracts** negotiated with the department[.]

(Emphasis added.)

The HLRB concluded that HRS § 302B-9(a)(1)(C) "is applicable to Unit 01 supplemental agreements, and that the language referring to 'master contracts negotiated with the department' was perhaps unartfully drafted[.]"[13] The Board also dismissed UPW's arguments that inconsistent or conflicting MOAs or supplemental agreements would contravene Article X, section 3 of the Hawai'i State Constitution.[14] The HLRB also disagreed with UPW's argument that pursuant to the definition of the term "supplemental," a "supplemental agreement" may not subtract or deviate from a master agreement. The Board concluded that:

first, the express language of HRS § 302B-9(a)(1)(C) indicates the Legislature's intent that "supplemental agreements" may differ from master agreements; and second, HRS § 89-10.55(c) contemplates both supplemental agreements and MOAs - it would be mere semantics to hold that a charter school may negotiate a memorandum of agreement that subtracts or deviates from a master agreement, but not a supplemental agreement that does so.

Lastly, the Board clarified that it

identifies three types of negotiations at issue in this proceeding: master agreements; MOAs or supplemental agreements affecting employees of more than just charter schools; and MOAs or supplemental agreements affecting only

---

[13] The HLRB noted that HRS § 302B-9(a)(1)(C) provides that supplemental agreements may differ from master contracts "negotiated with the department"[,] which apparently refers to the Department of Education. The Board concluded that this provision was "unartfully drafted" because HRS §§ 89-6(d) and 89-10.55(b) "does not include the DOE as part of that employer group." The Board nevertheless concluded that the "apparent ambiguity does not change the Board's conclusions herein, as the Board believes the statutory provisions of chapter 89 . . . are clear."

[14] Article X, section 3 of the Hawai'i State Constitution provides that the BOE shall have the power "to formulate statewide educational policy and appoint the superintendent of education as the chief executive officer of the public school system." HAW. CONST. ART. X, § 3.

> employees of charter schools.  For master agreements, negotiations shall be conducted by the employer group as provided for in HRS § 89-6(b); for MOAs and supplemental agreements affecting employees of more than just charter schools, negotiations shall be conducted as provided for in HRS § 89-6(e); and for MOAs and supplemental agreements affecting only employees of charter schools, negotiations shall be conducted as provided by HRS § 89-10.55(c).

UPW filed a notice of appeal from the HLRB Order with the Circuit Court on March 3, 2009.  UPW agreed with the HLRB Order on the first two issues, but argued that the Board's third ruling, "that a local school board or a charter school may negotiate a supplemental agreement which is 'inconsistent or in conflict with' a master agreement entered with the State of Hawaii or a supplemental agreement entered with the Board of Education"[,] was in error.

Intervenors filed an answer on March 19, 2009 asking the Court to affirm the HLRB Order in its entirety.  On March 23, 2009, the HLRB also filed an answer.

In its brief to the Circuit Court, UPW claimed that the HLRB exceeded its authority by "amending the terms 'employer' and 'collective bargaining'" as set forth in HRS § 89-2 by allowing LSBs to enter into supplemental agreements which differed from master CBAs.  UPW further claimed that the Board's Order is contrary to the collective bargaining process contemplated under HRS § 89-6(d) and HRS § 89-6(e) because it declares that LSBs "may negotiate supplemental agreements containing terms which 'subtract or deviate' from a master agreement . . . and which may be 'inconsistent or in conflict with' the master agreement or supplemental agreements entered with the State of Hawaii or the Board of Education."  Finally, UPW argued that the Board erred in relying on HRS § 302B-9, in concluding that LSBs may negotiate supplemental agreements and MOAs which differ from a master CBA, because HRS § 302B-9 conflicts with HRS Chapter 89 and is therefore preempted under HRS § 89-19.

In its answering brief, the HLRB argued that it correctly found that MOAs or supplemental agreements may be inconsistent with or in conflict with master agreements, MOAs, or supplemental agreements.  The HLRB contended that its conclusion

resulted from "a straightforward analysis of the statutory framework regarding negotiations by local school boards" and based on the fact that:

> [1]    there were no provisions expressly prohibiting MOAs or supplemental agreements which were inconsistent or in conflict with the master agreements or subsequent MOAs or supplemental agreement entered into by the UPW, the State of Hawaii and the DOE.
>
> [2]    HRS § 89-10.55(c) provides a limitation on the negotiation of an MOA or supplemental agreement in that such negotiations are "subject to the conditions and requirements contained in the applicable sections of [HRS Chapter 89] governing any memorandum of agreement or supplemental agreement."
>
> [3]    the express language of HRS § 302B[-9](a)(1)(C) indicat[es] the Legislature's intent [] that "supplemental agreements" may differ from master agreement[.]

On July 20, 2009, the Intervenors filed an answering brief contending, amongst other things, that HRS § 302B-9 permits supplemental agreements to deviate from a master CBA and does not conflict with any provision of HRS Chapter 89.  The Intervenors highlighted that:  (1) neither the charter schools nor the UPW are required to enter into any supplemental agreement, and any such agreement "would exist only by the **mutual consent** of the relevant parties"; (2) that the term "supplemental", by its very nature, is something that differs from a master CBA; and (3) nothing in Chapter 89 prevents a supplemental agreement from deviating from a master CBA.

UPW filed a reply brief, raising for the first time its "merit principle" argument.  UPW argued, *inter alia*, that the "merit system" is an "established policy of government" that has "state-wide application," and because charter schools are not "public employers" within the meaning of HRS Chapter 89, "they lack the statutory authority to deviate or repudiate agreements negotiated by the Board of Education and the Governor on a statewide basis."  UPW also proffered definitions of "deviate" and "supplemental" in support of its argument that LSBs "may negotiate additions to what is lacking [in a master CBA] through supplemental agreements" but that it may not "subtract" or "deviate" from what has already been negotiated into the master

agreement. Lastly, UPW argued that the HLRB's conclusion that a LSB may not "repudiate" an agreement, but may enter into a supplemental agreement that "differs" from an agreement, is "inherently inconsistent."

A hearing was held on August 10, 2009. UPW essentially reiterated the arguments in its briefs to the Circuit Court and clarified its argument relating to HRS § 302B-9.[15] Essentially, UPW argued that because HRS § 302B-9 specifically references agreements negotiated with the DOE, and whereas Unit 1 does not negotiate with the DOE, HRS § 302B-9(a)(1)(C) does not apply to charter school collective bargaining for Unit 1 employees, and therefore, supplemental agreements pertaining to that bargaining Unit may not differ from the master CBA. The HLRB rested on its brief, but stressed that "any kind of supplemental agreement would be subject to the agreement of the exclusive representative which is the UPW." The Intervenors agreed with the HLRB and responded to UPW's arguments, urging the Circuit Court to read the "straightforward" and "well-written" HLRB Order. At the conclusion of the arguments, the Circuit Court declared that it was "going to affirm the board's decision"[,] concluding that "the board's findings were not clearly erroneous and it's conclusions of law are based on substantial evidence and the construction of the statutes within its jurisdiction."

---

[15]     THE COURT: Okay. And then how do you address or what is your response to 302B-9 entitled Exemptions From State Laws which under A-1 says charter school shall be exempt from collective bargaining under Chapter 89 provided that, and then in particular subsection C talks about supplemental agreements may differ from the master contracts negotiated with the department. So you have the word "differ."

[UPW]: The department is the DOE. That's the Board of Education. . . . whereas they negotiate contracts with the teachers union in unit 5. The DOE, the Board of Education does not negotiate a master agreement with the UPW. . . . You have to apply those terms as they are, and they are inapplicable because the DOE is not an -- an employer within -- for the purpose of multi-employer bargaining under 89- . . . 6(d) which leads to a master agreement. So that provision is inapplicable to us to unit 1.

The Circuit Court filed its order on August 18, 2009 affirming the HLRB Order and finding:

> After reviewing the entire record and considering the written submissions of the parties and oral arguments presented, the Court finds that the Board's findings of fact in Order No. 2585, dated February 2, 2009, are not clearly erroneous, and its conclusions of law are based upon the substantial evidence in the record and the construction of statutes within its jurisdiction.

Judgment was entered on August 19, 2009.  A notice of appeal to this Court was timely filed by UPW.

II.  POINTS OF ERROR

UPW raises four points of error on its appeal to this court, arguing that the Circuit Court erred when it affirmed the HLRB Order because:  (1) the HLRB exceeded its statutory authority by amending the term "employer" and "collective bargaining" under HRS § 89-2; (2) the HLRB's Order is contrary to the collective bargaining process intended by HRS §§ 89-6(d) and 89-6(e); (3) the HLRB Order allows a local charter school board to undermine a statewide merit system; and (4) the Board erroneously concluded that HRS § 89-19 did not preempt HRS § 302B-9 with respect to charter schools.

III. APPLICABLE STANDARDS OF REVIEW

This is a secondary appeal from the decision of an administrative agency.

> Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal.  The standard of review is one in which [the appellate] court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) (1993) to the agency's decision.
>
> HRS § 91-14, entitled "Judicial review of contested cases," provides in relevant part:
>
> > (g)  Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> >
> > > (1)  In violation of constitutional or statutory provisions; or
> > > (2)  In excess of the statutory authority or jurisdiction of the agency; or
> > > (3)  Made upon unlawful procedure; or
> > > (4)  Affected by other error of law; or

18

> (5)   Clearly erroneous in view of the reliable,
> probative, and substantial evidence on the
> whole record; or
>
> (6)   Arbitrary, or capricious, or characterized
> by abuse of discretion or clearly
> unwarranted exercise of discretion.
>
> Under HRS § 91-14(g), conclusions of law are reviewable
> under subsections (1), (2), and (4); questions regarding
> procedural defects under subsection (3); findings of fact
> under subsection (5); and an agency's exercise of discretion
> under subsection (6).

United Pub. Workers, AFSCME, Local 646, AFL-CIO, v. Hanneman, 106
Hawai'i 359, 363, 105 P.3d 236, 240 (2005) (brackets in original
omitted) (quoting Paul's Elec. Serv., Inc. v. Befitel, 104
Hawai'i 412, 416, 91 P.3d 494, 498 (2004)).  "Pursuant to HRS
§ 91-14(g), an agency's conclusions of law are reviewed de novo."
United Pub. Workers, 106 Hawai'i at 363, 105 P.3d at 240
(citation and internal quotation marks omitted).

     "Questions of statutory interpretation are questions of
law to be reviewed *de novo* under the right/wrong standard."  UPW
v. City & Cnty. of Honolulu, 124 Hawai'i 367, 369, 244 P.3d 604,
606 (App. 2010).  Our statutory construction is guided by the
following well-established principles:

> our foremost obligation is to ascertain and give effect to
> the intention of the legislature, which is to be obtained
> primarily from the language contained in the statute itself.
> And we must read statutory language in the context of the
> entire statute and construe it in a manner consistent with
> its purpose.
>
> When there is doubt, doubleness of meaning, or
> indistinctiveness or uncertainty of an expression used in a
> statute, an ambiguity exists.
>
> In construing an ambiguous statute, the meaning of the
> ambiguous words may be sought by examining the context, with
> which the ambiguous words, phrases, and sentences may be
> compared, in order to ascertain their true meaning.
> Moreover, the courts may resort to extrinsic aids in
> determining legislative intent.  One avenue is the use of
> legislative history as an interpretive tool.
>
> The appellate court may also consider the reason and spirit
> of the law, and the cause which induced the legislature to
> enact it to discover its true meaning.

Id. (quoting Lingle v. HGEA, 107 Hawai'i 178, 183, 111 P.3d 587,
592 (2005)) (brackets omitted).

     Moreover,

> [W]here an administrative agency is charged with the
> responsibility of carrying out the mandate of a statute

> which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.

Morgan v. Planning Dept., Cnty. Of Kauai, 104 Hawai'i 173, 180, 86 P.3d 982, 989 (2004) (citing Ka Pa'akai O Ka 'Aina v. Land Use Comm'n, State of Hawai'i, 94 Hawai'i 31, 41, 7 P.3d 1068, 1078 (2000)).  Stated differently:

> Where an agency is statutorily responsible for carrying out the mandate of a statute which contains broad or ambiguous language, that agency's interpretation and application of the statute is generally accorded judicial deference on appellate review.  However, an interpretation by an agency of a statute it administers is not entitled to deference if the interpretation is plainly erroneous and inconsistent with both the letter and intent of the statutory mandate.

TIG Ins. Co. v. Kauhane, 101 Hawai'i 311, 321, 67 P.3d 810, 820 (App. 2003) (citations, internal quotation marks, and brackets omitted).

IV.  DISCUSSION

UPW's points of error on appeal are ALL based on the second half of the third conclusion stated in the HLRB Order:

> Absent express delegation by another local school board or statutory authority, local school boards may only negotiate on behalf of, and contractually bind, their own charter schools.  However, the Board clarifies that more than one local school board may be involved in negotiations that affect more than one charter school (see HRS § 302B-8(b)(15)).  **Further, the Board concludes that MOAs or supplemental agreements so negotiated may be inconsistent or conflict with master agreements as well as supplemental agreements or MOAs negotiated pursuant to HRS § 89-6(e), subject to certain conditions and requirements contained in chapter 89 governing any memorandum of agreement or supplemental agreement**, as discussed earlier.

UPW contends that this ruling:  (1) improperly amends the definition of "employer" and "collective bargaining" under HRS § 89-2; (2) is contrary to the collective bargaining process contemplated under HRS § 89-6; (3) undermines the statewide "merit system" policy; and (4) improperly relies on HRS § 302B-9.

First, UPW argues that the HLRB exceeded its authority and jurisdiction by amending the definitions of "collective bargaining" and "employer" in HRS § 89-2 by declaring that LSBs may negotiate MOAs and supplemental agreements that are "inconsistent" or in "conflict with" master agreements and other

preexisting MOAs and supplemental agreements.  UPW claims that pursuant to the HLRB Order:

> local school boards of charter schools fall within the meaning of the term "employer" under chapter 89 . . . and may enter supplemental agreements which "differ," "subtract or deviate" from master agreements . . . or are "inconsistent" and "in conflict with" agreements negotiated by the State of Hawaii and the Board of Education who are the statutory employers of unit 1 employees in the Department of Education[.]

UPW reasons that "[n]o where in [HRS § 89-2] do the terms 'collective bargaining' and 'employer' make any reference to 'local school boards of charter schools,' as having such broad authority and powers[.]"

Pursuant to HRS § 89-2, "Collective bargaining" is defined, in relevant part, as:

> the performance of the mutual obligations of the public employer and an exclusive representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to wages, hours, amounts of contributions by the State and counties to the Hawaii employer-union health benefits trust fund, and other terms and conditions of employment, except that by any such obligation neither party shall be compelled to agree to a proposal or be required to make a concession. . . .

HRS § 89-2.  "Employer" or "public employer," in relevant part, refers to:

> the governor in the case of the State, the respective mayors in the case of the counties, the chief justice of the supreme court in the case of the judiciary, the board of education in the case of the department of education, the board of regents in the case of the University of Hawaii, the Hawaii health systems corporation board in the case of the Hawaii health systems corporation, and any individual who represents one of these employers or acts in their interest in dealing with public employees. . . .

Id.  Although UPW is correct in its general assertion that HRS § 89-2 does not refer to "local school boards of charter schools," its argument that the Legislature "chose not to include the local school boards of charter schools" in its definition of "employer" is misguided.

In 2006, the Legislature enacted HRS § 89-10.55, which specifically governs charter school collective bargaining and

provides an instance where LSBs *are* considered "employers." Pursuant to HRS § 89-10.55,

> For the purpose of negotiating a collective bargaining agreement for charter school employees who are assigned to an appropriate bargaining unit, the employer shall be determined as provided in section 89-6(d).

HRS § 89-10.55(b) (Supp. 2006). However, the statute goes on to provide:

> **For the purpose of negotiating a memorandum of agreement or a supplemental agreement** that only applies to employees of a charter school, **the employer shall mean the local school board**, subject to the conditions and requirements contained in the applicable sections of this chapter governing any memorandum of agreement or supplemental agreement.

HRS § 89-10.55(c) (Supp. 2006) (emphasis added).

The intent of Act 298 was to "[c]larif[y] collective bargaining provisions for charter school employees." Conf. Comm. Rep. No. 223, in 2006 House Journal, at 1885, 2006 Senate Journal, at 1025. Specifically, HRS § 89-10.55 was added in order to "make conforming amendments to various sections of the Hawaii Revised Statues in accordance with the provisions of the new charter school law." 2006 Haw. Sess. Laws Act 298, § 4 at 1216. HRS § 89-10.55, which by its plain language appears to authorize LSBs to negotiate a "memorandum of agreement or a supplemental agreement that only applies to employees of a charter school," is consistent with the Legislative purpose in authorizing the establishment of a charter school system, *i.e.*, to "nurture the ideal of more autonomous and flexible decision-making at the school level." 1999 Haw. Sess Laws Act 62, § 1 at 77. Authorizing LSBs to negotiate its own MOAs and supplemental agreements, specific to its charter school employees, comports with the reason and spirit of the law to promote autonomy and flexible decision-making at the school level.

Moreover, it is a cardinal rule of statutory construction that

> where there is a "plainly irreconcilable" conflict between a general and a specific statute concerning the same subject matter, the specific will be favored. However, where the statutes simply overlap in their application, effect will be given to both if possible[.]

Mahiai v. Suwa, 69 Haw. 349, 356-57, 742 P.2d 359, 366 (1987) (citations omitted). Additionally, "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another." HRS § 1-16 (2009). Here, HRS § 89-10.55 specifically governs charter school collective bargaining, as distinct from general collective bargaining, and provides that for the sole purpose of negotiating MOAs and supplemental agreements that apply only to employees of a charter school, that school's LSB is deemed to be the "employer." It is possible to give effect to the definitions of "employer" in both HRS § 89-2 and HRS § 89-10.55 because pursuant to HRS § 89-10.55, a LSB is considered an "employer" for the limited purpose of negotiating MOAs and supplemental agreements particular to the employees in its charter school, while the general "employer" definition under HRS § 89-2 is meant to apply to collective bargaining of general applicability.

UPW's allegation that the HLRB "amended" the definition of "collective bargaining" and "employer" by declaring that LSBs fall within the meaning of the term "employer" is misleading. In its Order, the HLRB did not attempt to add LSBs to the statutory definition of "employer" under HRS § 89-2 for the purpose of negotiating agreements of general applicability; instead, the HLRB interpreted the plain language and legislative intent of Chapter 89, focusing on the specific grant of authority given to LSBs under HRS § 89-10.55. Further, the HLRB Order did not conclude that LSBs are "employers" under HRS § 89-2, but rather, that under a *separate* limited-use statute, a LSB may be considered an "employer." Inasmuch as HRS § 89-10.55 authorizes LSBs to negotiate supplemental agreements directly with employee organizations, this statute is clear and unambiguous.

Accordingly, we conclude that HLRB did not exceed its authority and jurisdiction, nor did it improperly "amend" the definitions articulated in HRS § 89-2, as its conclusion that a LSB may negotiate MOAs or supplemental agreements that apply only

to its respective employees is consistent with both HRS Chapter 89 and the laws governing charter schools.

Second, UPW contends that the HLRB Order is "contrary" to the collective bargaining process set forth in HRS § 89-6(d) and (e), and is "contradictory" to the conclusions rendered on the first two issues of the Order, inasmuch as it allows LSBs to negotiate supplemental agreements which "subtract or deviate" from a master CBA or supplemental agreements entered with the State or the BOE. We disagree.

The ability of a LSB to negotiate MOAs and supplemental agreements does not in any way change or detract from the ultimate authority of the employer group, defined pursuant to HRS § 89-6(d), to negotiate master CBAs. In addition, while a LSB may negotiate an MOA or supplemental agreement that is "inconsistent with" a master CBA, MOA, or supplemental agreement entered by and between UPW and the DOE pursuant to HRS § 89-6(e), this does not authorize a LSB to "repudiate" the terms of any of those agreements. Although the difference between the terms "repudiate" and "inconsistent" has not been discussed by the Hawai'i courts, nor are these terms defined by any relevant statute, generally, "repudiate" means "[t]o reject or renounce (a duty or obligation); esp., to indicate an intention not to perform (a contract)." Black's Law Dictionary 1418 (9th ed. 2009). "Inconsistent," on the other hand, is defined as "[l]acking agreement among parts; not compatible with another fact or claim[.]" Id. at 834. Based on the nature of collective bargaining and the definitions of "inconsistent" and "repudiate," the negotiation of a subsequent inconsistent agreement does not amount to a repudiation of an initial agreement where the parties continue to adhere to their contractual duties and obligations, albeit, upon different agreed-upon terms. Indeed, the parties must mutually agree to any memorandum of agreement or supplemental agreement that only applies to employees of a charter school.

There are no statutory restrictions or conditions in HRS Chapter 89 that expressly prohibit MOAs or supplemental

24

agreements that are "inconsistent" or "in conflict with" existing master CBAs, MOAs, or supplemental agreements. The 2006 enactment of HRS § 89-10.55 made clear that "[e]mployees of charter schools shall be assigned to an appropriate bargaining unit as specified in section 89-6," and are therefore subject to the CBA negotiated pursuant to HRS § 89-6(d). See HRS § 89-10.55(a), (b). Moreover, HRS § 89-6(e) provides that in addition to negotiating CBAs under HRS § 89-6(d),

> each employer may negotiate, independently of one another, supplemental agreements that apply to their respective employees; provided that any supplemental agreement reached between the employer and the exclusive representative shall not extend beyond the term of the applicable collective bargaining agreement and shall not require ratification by employees in the bargaining unit.

HRS § 89-6(e), therefore, provides that each of the public employers listed in HRS § 89-6(d) may negotiate supplemental agreements with the exclusive representative of a particular bargaining unit and that such supplemental agreements apply only "to their respective employees." Accordingly, a charter school will be bound by master CBAs, MOAs, and supplemental agreements negotiated pursuant to HRS § 89-6(d) and (e) that generally apply to all employees in a particular bargaining unit, if it employs members of that unit.

HRS § 89-10.55 provides an additional mechanism, specifically for LSBs, to negotiate charter school-specific MOAs and supplemental agreements. Pursuant to HRS § 89-10.55(c), "for the purpose of negotiating a memorandum of agreement or a supplemental agreement that only applies to employees of a charter school, the employer shall mean the local school board." Therefore, it is clear that LSBs are specifically granted the authority to negotiate MOAs and supplemental agreements that apply to their respective charter school employees.

Most importantly, HRS § 89-10.55(c) provides that MOAs or supplemental agreements negotiated between a LSB and the exclusive representative of a bargaining unit remain "subject to the conditions and requirements contained in the applicable sections of [HRS Chapter 89] governing any memorandum of

agreement or supplemental agreement." Id. The only "conditions and requirements" contained in HRS Chapter 89 that can be construed as governing MOAs and supplemental agreements include:

(1) HRS § 89-2, which defines "collective bargaining," provides that "by any such obligation [to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement] **neither party shall be compelled to agree to a proposal or be required to make a concession**. (Emphasis added.) See also HRS § 89-9(a) (governing the scope of negotiations, and articulating the same "obligation").

(2) HRS § 89-6(e), requires that "any supplemental agreement reached between the employer and the exclusive representative **shall not extend beyond the term of the applicable collective bargaining agreement and shall not require ratification by employees in the bargaining unit**." (Emphasis added).

(3) HRS § 89-10(a) (2012), governing written agreements, provides that "**[r]atification is not required** for other agreements effective during the term of the collective bargaining agreement, whether a supplemental agreement, an agreement on reopened items, or a memorandum of agreement, and any agreement to extend the term of the collective bargaining agreement." (Emphasis added). Moreover, HRS § 89-10(a) provides that such an agreement "**shall be reduced to writing and executed by both parties**." Id. (emphasis added).

(4) HRS § 89-13 (2012), governing prohibited practices provides that "**[i]t shall be a prohibited practice**" for a public employer or its designated representative, or for an employee organization or its designated agent to willfully "**[r]efuse to bargain collectively in good faith**" with the exclusive representative or the public employer as required under HRS § 89-9. HRS § 89-13(a)(5)&(b)(2) (emphasis added).

(5) HRS § 89-13 further mandates that a public employer or its designated representative is prohibited from "**[v]iolat[ing] the terms of a collective bargaining agreement**." HRS § 89-13(a)(8)&(b)(5) (emphasis added).

There is nothing in these "conditions and requirements," or elsewhere in HRS Chapter 89, that prohibits MOAs or supplemental agreements which differ from, are inconsistent with, or are in conflict with a master CBA or any other preexisting agreement.  The only statutory language in HRS Chapter 89 governing "inconsistent" proposals is provided for under HRS § 89-9(d) (emphasis added):

> The employer and the exclusive representative **shall not agree to any proposal which would be inconsistent with the merit principle or the principle of equal pay for equal work pursuant to section 76-1** or which would interfere with the rights and obligations of a public employer to:
>
> (1) Direct employees;
> (2) Determine qualifications, standards for work, and the nature and contents of examinations;
> (3) Hire, promote, transfer, assign, and retain employees in positions;
> (4) Suspend, demote, discharge, or take other disciplinary action against employees for proper cause;
> (5) Relieve an employee from duties because of lack of work or other legitimate reason;
> (6) Maintain efficiency and productivity, including maximizing the use of advanced technology, in government operations;
> (7) Determine methods, means, and personnel by which the employer's operations are to be conducted; and
> (8) Take such actions as may be necessary to carry out the missions of the employer in cases of emergencies.
>
> This subsection . . . shall not preclude negotiations over the procedures and criteria on promotions, transfers, assignments, demotions, layoffs, suspensions, terminations, discharges, or other disciplinary actions as a permissive subject of bargaining during collective bargaining negotiations or negotiations over a memorandum of agreement, memorandum of understanding, or other supplemental agreement.

This provision, titled "scope of negotiations," is equally applicable to the negotiation of a master CBA as it is to the negotiation of an MOA and/or supplemental agreement, and serves to require adherence to the merit principle in the negotiation of an agreement.  While it mandates consistency with the merit principle, it does not prohibit an MOA or a supplemental agreement to deviate from a master CBA.  Therefore, we conclude that an MOA and/or a supplemental agreement may be inconsistent with a master CBA, so long as the agreement continues to comply with the merit principle and other articulated rights and obligations of a public employer.

27

UPW argues that supplemental agreements entered into pursuant to HRS § 89-10.55 "can only add new terms which have not previously been negotiated into master agreements under Section 89-6(d), HRS, or into DOE supplemental agreements by the Board of Education under Section 89-9(e), HRS." Such a limited construction of the legislative grant of authority to LSBs to enter into MOAs and supplemental agreements is not warranted nor provided for under the statutory scheme governing charter school collective bargaining.

The HLRB Order concluded that LSBs may enter into MOAs or supplemental agreements that are inconsistent or in conflict with master CBAs "subject to certain conditions and requirements contained in chapter 89[.]" Absent any articulable "conditions and requirements" in HRS Chapter 89 prohibiting the negotiation of an MOA or supplemental agreement that is inconsistent with a master agreement, we conclude that the HLRB's Order is consistent with both the collective bargaining process and the statutory scheme established under Chapter 89, and does not grant the LSBs any more authority than that which is granted by statute.

Third, UPW further argues that the HLRB Order, inasmuch as it construes HRS § 89-10.55 to authorize LSBs to enter into supplemental agreements and MOAS that may differ from master CBAs, allows LSBs to "disregard agreements entered with the [DOE] restoring the merit principle to all public charter schools[.]"[16] HLRB's Order specifically provides:

> Local school boards of charter schools may not repudiate the terms of said Unit 01 master agreement or the terms of the memoranda of agreement or supplemental agreements entered by and between the UPW and the Department of Education pursuant to HRS § 89-6(e).

_____

[16] UPW refers to the "merit principle" established under HRS § 76-1. See note 2, supra. With regard to such "agreements" entered with DOE "restoring the merit principle to all public charter schools," UPW cites a March 15, 2004 HLRB Stipulation and Order. The March 15, 2004 Order explains that the Department of Human Resources Development informed BOE that employees of public charter schools in the DOE do not have civil service status and are no longer part of the merit system. The Stipulation and Order required the BOE to "process all currently exempt public charter school employees in classified positions through the statewide merit system and restore them to civil service status."

Moreover, the HLRB Order provides that

MOAs or supplemental agreements [] negotiated may be inconsistent or conflict with master agreements as well as supplemental agreements or MOAs negotiated pursuant to HRS § 89-6(e), subject to certain conditions and requirements contained in chapter 89 governing any memorandum of agreement or supplemental agreement[.]

As noted above, HRS § 89-9(d) prohibits the employer and the exclusive representative from agreeing to "any proposal which would be inconsistent with the merit principle or the principle of equal pay for equal work pursuant to section 76-1[.]" Additionally, HRS § 89-1(b)(2) requires "public employers to negotiate with and enter into written agreements with exclusive representatives on matters of wages, hours, and other conditions of employment, while, at the same time, maintaining the merit principle pursuant to section 76-1[.]" Inasmuch as a LSB must negotiate MOAs and supplemental agreements "subject to certain conditions and requirements contained in chapter 89," any agreement negotiated must be consistent with the merit principle as required under HRS §§ 89-1 and 89-9.

Based on the plain language of HRS § 89-10.55(c), and the conditions imposed on collective bargaining negotiations under HRS §§ 89-1 and 89-9, LSBs, like other public employers, must maintain the merit principle in all negotiated agreements. Accordingly, UPW's third point of error on appeal is without merit.

Fourth, UPW argues that the HLRB "failed to give [effect] to Section 89-19, HRS, that expressly states chapter 89, HRS, takes precedence over all conflicting statutes governing the same 'subject matter' and shall pre-empt other 'legislation . . . adopted by the State,'" and therefore, "[t]o the extent Section 302B-9(a), HRS, would allow charter schools to negotiate conflicting or inconsistent terms, it is preempted under Chapter 89, HRS."[17] Pursuant to HRS § 89-19, HRS Chapter 89

---

[17] Essentially, UPW is claiming that HRS § 302B-9, which allows a supplemental agreement to differ from a master CBA, is in conflict with HRS § 89-10.55 and HRS § 89-6, governing the negotiation of MOAs and supplemental agreements.

shall take precedence over all conflicting statutes concerning this subject matter and shall preempt all contrary local ordinances, executive orders, legislation, or rules adopted by the State, a county, or any department or agency thereof, including the departments of human resources development or of personnel services or the civil service commission.

HRS § 302B-9(a) provides that charter schools are subject to the collective bargaining laws under HRS Chapter 89, but may enter into supplemental agreements with an exclusive representative, and that these supplemental agreements "may differ from the master contracts negotiated with the department[.]" HRS § 302B-9(a)(1)(C). As discussed supra, there is nothing in HRS Chapter 89 prohibiting the negotiation of an MOA or a supplemental agreement that is "inconsistent with" or which "differs" from a master CBA. Therefore, HRS § 302B-9 is not a "conflicting statute concerning [the same] subject matter" within the meaning of HRS § 89-19. Thus, HRS § 302B-9 is not preempted by HRS Chapter 89 or any collective bargaining agreement negotiated thereunder, and the HLRB's reliance on HRS § 302B-9 was not misplaced. Accordingly, this argument is without merit.

V.   CONCLUSION

For these reasons, the Circuit Court's August 19, 2009 Judgment is affirmed.

DATED: Honolulu, Hawaiʻi, December 6, 2013.

On the briefs:

Herbert R. Takahashi
Danny J. Vasconcellos
Rebecca L. Covert
(Takahashi Vasconcellos &
 Covert)
for Petitioner/Appellant-
Appellant

James E. Halvorson
Richard H. Thomason
Deputy Attorneys General
for Intervenors/Appellees-
Appellees

Valri Lei Kunimoto
(Hawaii Labor Relations Board)
for Agency/Appellees-Appellees

Chief Judge

Associate Judge

Associate Judge